Robert P. WHELAN, Plaintiff,

v.

Mario CUOMO, Secretary of State of the State of New York, Defendant.

No. 75–C–549.

United States District Court,
E. D. New York.

June 15, 1976.

Robert P. Whelan, pro se.

Louis J. Lefkowitz, Atty. Gen. of State of New York, New York City, for defendant; A. Seth Greenwald, Asst. Atty. Gen., New York City, of counsel.

JUDD, District Judge.

## MEMORANDUM AND ORDER

In this civil rights action plaintiff seeks to enjoin the election of Congressmen from New York, on the theory that 2 U.S.C. § 2, fixing the number of representatives at 435, is unconstitutional.

Plaintiff seeks the convening of a three-judge court pursuant to 28 U.S.C. §§ 2281, 2284, and summary judgment pursuant to F.R.Civ.P. Rule 56. The defendant has filed his own motion for summary judgment.

### Facts

Plaintiff is a citizen of the United States of America and a resident of New York State. Plaintiff has been an eligible voter since 1944 and avers that he has never failed to vote in an election for a member of the House of Representatives. The defendant is the Secretary of State of the

State of New York and, as such, is charged with the responsibility to

. . . prepare a general certificate under the seal of the state and attested by him as secretary thereof, addressed to the house of representatives of the United States, in that congress for which any person shall have been chosen, of the due election of all persons chosen at that election as representatives of this state in congress, and shall transmit the same to the house of representatives at its first meeting. . . .

N.Y. Election Law § 278(4).

The plaintiff seeks to obtain a declaratory judgment that 2 U.S.C. §§ 2 and 2a are unconstitutional and to enjoin the defendant from performing his responsibility under § 278(4) of the New York Election Law. Section 2 of Title 2 of the United States Code fixes the number of members of the House of Representatives at 435. Section 2a provides the method of reapportioning this number of representatives among the several states in accordance with their population as determined by the decennial census.

Simply put, the plaintiff's complaint avers that, given the present population of the nation, section 2 of Title 2, in fixing the number of members of the House of Representatives at 435, violates Article I, section 2, clause 3 of the Constitution. Article I, section 2, clause 3 deals first with the apportionment of representatives and direct taxes among the states, then provides for a census ("enumeration") every ten years, and then specifies, in relevant part:

The Number of Representatives shall not exceed one for every thirty Thousand, but each State shall have at Least one Representative; . . .

The balance of clause 3 sets forth the initial apportionment of 65 representatives.

The population of the United States was over 203 million at the time of the 1970 census. If there were one representative for each 30,000 of population, the House of Representatives would consist of over 6,700 members.

## Discussion

Plaintiff's motions may be defeated on at least two procedural grounds even before the court reaches the merits. First, in an action which attacks the constitutionality of an act of Congress, notice must be given to the United States Attorney General and the United States Attorney. 28 U.S.C. § 2284(2). This was not done. Second, the New York Secretary of State exercises only a ministerial function in certifying the results of the votes cast for Congressmen. *Matter of Hart*, 161 N.Y. 507, 55 N.E. 1058 (1900). His functions concerning Congressional elections are not comparable to those of the Secretary of State of Tennessee concerning state legislators. Therefore, there is no significance in the fact that the Secretary of State of Tennessee was the defendant in *Baker v. Carr*, 179 F.Supp. 824 (M.D.Tenn.1959), *reversed*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The result of an injunction against the New York Secretary of State would be simply to leave New York with no representatives in Congress, since he would have no power to fix a different number to be elected. The answer to the complaint presents a defense of failure to join an indispensable party, although this was not pressed in defendant's brief. F.R.Civ.P. 19.

Mindful of the need for a district court to canvass all issues that may be presented on appeal, the court will address itself to the constitutional issue in spite of the preliminary barriers to plaintiff's success in the action.

On its face, the language of the Constitution has not been contravened here. The population of the United States as of 1970, the year of the last official federal census, was 203,184,772. The number of representatives therefore does not exceed one for every 30,000, there being approximately one for every 467,000.

Plaintiff does not dispute these simple mathematics. Rather, plaintiff contends that the present ratio of one representative for every 467,000 contravenes the spirit, if not the letter, of Article I, section 2, clause 3 of the Constitution.

██ However, an examination of the history of the Constitutional Convention and the surrounding debate shows that plaintiff's position is without merit.

The provision which ultimately became the relevant portion of Article I, section 2, clause 3 is an example of several major compromises reached at the Constitutional Convention. An understanding of these broader issues is helpful to put the provision here into context. The first of these themes is the struggle between the large, more populous states and the smaller states. The division between the Senate and the House of Representatives reflects this basic tension. The Senate guaranteed some protection for the smaller states by giving each state equal weight regardless of its population, while the House was to reflect the interests of the people by distributing representatives according to each state's population.

The number of representatives allotted to each state was intricately tied to the basis for representation; specifically, whether wealth or population, or some combination of the two, was an appropriate basis, and how slaves should be counted for this purpose. A certain community of interests was achieved by tying the apportionment of representatives and direct taxes to the same standard.

Max Farrand's *The Records of the Federal Convention of 1787* is the most comprehensive source for the actual debates at the Constitutional Convention (hereinafter— Farrand).

On July 5, 1787, Elbridge Gerry reported to the Convention a series of resolutions of the Grand Committee. The first resolution read in relevant part:

> That in the first branch of the Legislature each of the States now in the Union be allowed one Member for every forty thousand inhabitants of the description reported in the seventh resolution of the Committee of the whole House.

1 Farrand 524, 526. The Gerry report on behalf of the Grand Committee was the first officially proposed ratio of representation.

The resolutions of the Committee of the Whole appeared in the Journal of the Convention on June 13 and represented a revision of the Virginia Plan submitted by Mr. Randolph to the Convention on May 29. Neither the Virginia Plan nor the resolutions of the Committee of the Whole had detailed any actual ratio of representation. 1 Farrand 20, 229–30.

The Gerry report triggered the first of a series of debates on what the ratio of representation in the House of Representatives should be, and the basis for any such ratio. The initial focus of that debate was whether property or population was an appropriate basis for any ratio to be fixed. 1 Farrand 536–37, 541–42. Gouverneur Morris voiced some concern that any ratio based on population would ultimately result in a shift of power to the "Western Country" to the detriment of the Atlantic States.

The statement of Rufus King of Massachusetts in support of a motion to refer the ratio of representation portion of the Gerry report to a special committee is noteworthy. James Madison's notes reflect the following:

> He [Mr. King] thought also that the Ratio of Representation proposed could not be safely fixed, since in a century & a half our computed increase of population would carry the number of representatives to an enormous excess;

1 Farrand 541. The motion to commit was passed, 7 to 3, and a committee of five (G. Morris, Gorham, Randolph, Rutledge and King) unanimously appointed on July 6, 1787. 1 Farrand 538, 542.

The Morris Committee of five reported back to the Convention on Monday, July 9th. The Morris Committee report urged that the first branch consist of 56 members (with the distribution amongst the several states specifically set forth) with the power "to augment the number of representatives: . . . upon the principles of . . . wealth and number of inhabitants." 1 Farrand 557–58. Mr. Gorham, a member of the committee of five, stated two objections to the ratio of one member for every 40,000 inhabitants:

The Ist. was that the Representation would soon be too numerous: the 2d. that the Westn. States who may have a different interest, might if admitted on that principal by degrees, out-vote the Atlantic. Both these objections are removed. The number will be small in the first instance and may be continued so, and the Atlantic States having ye. Govt. in their own hands, may take care of their own interest, by dealing out the right of Representation in safe proportions to the Western States. These were the views of the Committee.

1 Farrand 560. A vote authorizing the legislature to alter the number from time to time according to the Committee's principle of wealth and inhabitants passed 9 to 2. 1 Farrand 560. The original number of 56 representatives and their distribution among the several states were committed to a grand committee of thirteen, one delegate from each state. 1 Farrand 560–62.

Mr. King reported on behalf of this grand committee on July 10th. The King report proposed a first branch of 65 representatives (with the specific distribution set forth). 1 Farrand 563, 566. Various motions to amend the King report were made and defeated. Of particular interest is Mr. Madison's motion to double the number of representatives allowed to each state. His arguments in favor of the motion are quite similar to the position articulated by plaintiff in 'this case:

> They would not possess enough of the confidence of the people, and wd. be too sparsely taken from the people, to bring with them all the local information which would be frequently wanted. Double the number will not be too great even with the future additions from New States.

1 Farrand 568–69. The opposition pointed out the added expense and the dangers of excessive number reducing the body's efficiency. Messrs. Gerry and Read argued that the highest number of representatives might be fixed, thereby removing any danger of excess. Neither suggested an appropriate figure. Mr. Madison's motion was defeated 9 to 2. 1 Farrand 569–70.

The first step toward resolution was reached when the Convention unanimously agreed on July 12th that "direct Taxation ought to be proportioned according to representation." 1 Farrand 589. Having linked the burden of direct taxation and the advantage of representation to the same formula, the Convention on July 13th adopted the principle of population to govern both, 9 to 0. 1 Farrand 598–606.

On July 16th the Convention approved by a vote of 5 to 4 the report from the grand committee as amended. The resolution fixed the number of representatives in the first branch at 65, with the same distribution as urged in the King report of July 10th. The resolution did not fix a specific ratio of representation but simply adopted the "principle . . . of inhabitants" for both the number of representatives in the House and for the imposition of direct taxes. 2 Farrand 13–14.

On July 23, 1787 the resolution dealing with representation in the first branch of Congress was referred, along with a full set of resolutions, to a Committee of Detail. 2 Farrand 129.

Various other drafts and papers were submitted to the Committee of Detail for their consideration. An outline of the Pinckney Plan which was submitted to the Committee urged a ratio of representation without suggesting one. 2 Farrand 135. A document in the handwriting of Mr. Randolph was submitted suggesting that "The house of delegates shall never be greater in number than . . . according to the ratio, recommended by congress." 2 Farrand 138–39.

On August 6th, Mr. Rutledge delivered the report of the Committee of Detail. The relevant provisions on representation in the House of Representatives fixed the original number at 65 members and a ratio of one for every 40,000 inhabitants thereafter. 2 Farrand 178.

On September 8th Hugh Williamson of North Carolina proposed a motion to reconsider the number of members in the House and to increase their number by half. The motion was a less ambitious effort to

achieve the same purpose as the Madison motion of July 10th. In fact, Mr. Madison seconded the Williamson motion. Madison's notes for September 8 reflect Alexander Hamilton's arguments in favor of the motion, noteworthy here for their consistency with the plaintiff's position in this case.

Col: Hamilton expressed himself with great earnestness and anxiety in favor of the motion. He avowed himself a friend to a vigorous Government, but would declare at the same time, that he held it essential that the popular branch of it should be on a broad foundation. He was seriously of opinion that the House of Representatives was on so narrow a scale as to be really dangerous, and to warrant a jealousy in the people for their liberties. He remarked that the connection between the President & Senate would tend to perpetuate him, by corrupt influence. It was the more necessary on this account that a numerous representation in the other branch of the Legislature should be established.

2 Farrand 553–54. The motion was defeated 5 to 6. 2 Farrand 554, 612.

On the same day, September 8th, a Committee of Style and Arrangement was appointed. 2 Farrand 553. On September 10 a 23 article document was referred to the Committee. Article IV, sections 3 and 4 in the document tracked the language of the Committee of Detail's report with one significant and unexplained difference. Instead of setting the rate of representation at "one for every forty thousand" inhabitants, the section as reported to the Committee of Style stated that the number of representatives should be set by a rule "*not exceeding* the rate of one for every forty thousand. Provided that every State shall have at least one representative." 2 Farrand 566. (Emphasis added).

The Report of the Committee of Style was issued on September 12, 1787. Article I, section 2, clause (b) stated in relevant part:

The number of representatives shall not exceed one for every forty thousand, but each state shall have at least one representative   .   .   .

2 Farrand 591.

On September 17, 1787, the last day of the Constitutional Convention, Mr. Gorham (who had been a member of the Committee of Detail) rose to move what proved to be the last change in the text of the constitution before its adoption. His motion was to strike "40,000" and insert in its place "30,000" in the ratio of representation. "This would not he remarked establish that as an absolute rule, but only give Congress a greater latitude which could not be thought unreasonable." George Washington, president of the Convention, spoke in favor of this change. It was the only occasion during the entire Convention that he expressed his personal views. 2 Farrand 644. The motion carried unanimously, 2 Farrand 644, in part at least in deference to the judgment of Mr. Washington. 3 Farrand 337, 358.

The change was apparently in response to the continued criticism of the smallness of the membership of the House of Representatives. 2 Farrand 563, 638.

The historical record of the Constitutional Convention supports several conclusions. First, the bicameral legislature reflects a basic compromise between the small states and the larger ones. Second, there was considerable dissatisfaction with the small number of representatives in the House, but all efforts to increase the original number were defeated. Third, Congress was vested with authority to expand the number of members in the House and charged with the duty to apportion the membership among the several states. Finally, Congress was given considerable flexibility in determining the actual number of representatives so long as the total did not exceed one representative for every 30,000 inhabitants. This was done as a safeguard against the dangers of too numerous a body. Several members of the convention indicated subsequently a belief that the House would add one member for each additional 30,000 population as the nation grew. 3 Farrand 337, 358. James Wilson

of Pennsylvania spoke in favor of the one for every 30,000 ratio of representation at his state's ratification convention by speculating that "the House of Representatives will, within a single century, consist of more than six hundred members." 3 Farrand 159–60. James Madison also speculated on the future size of the House. He predicted that in 25 years the House would have 200 members; in 50 years, 400 members. The Federalist No. LV. Messrs. Wilson's and Madison's statements rested on two assumptions, only one of which proved correct: the nation's population did grow at a phenomenal pace; however, Congress has never seen fit to exercise its full prerogative and establish a representative for every 30,000 inhabitants. The flexibility to establish fewer representatives than the one for every 30,000 inhabitants which the constitution allows is implicit in Mr. Gorham's comment when he sponsored the motion to amend the provision to read: "The number of representatives shall not exceed one for every thirty thousand, . . . ." He stated: "This would not . . . establish . . . an absolute rule, but only give Congress a greater latitude which could not be thought unreasonable." The remark gains added weight because it is one of the few remarks addressed to this provision after the unexplained addition of the "not exceeding" language.

One final source is noteworthy as it bears not only on the intent of the Constitutional Convention but it eloquently defends the decision ultimately made by Congress in 2 U.S.C. § 2 to set the membership of the House of Representatives below the maximum that Article I, section 2, clause 3 permits. James Madison separately addressed each of four criticisms of the "number of which the House of Representatives is to consist" in four letters in the Federalist Papers (Nos. LV–LVIII)

> The charges exhibited against it are, first, that so small a number of representatives will be an unsafe depositary of the public interests; secondly, that they will not possess a proper knowledge of the local circumstances of their numerous constituents; thirdly, that they will be taken from that class of citizens which will sympathise least with the feelings of the mass of the people, and be most likely to aim at a permanent elevation of the few on the depression of the many; fourthly, that defective as the number will be in the first instance, it will be more and more disproportionate, by the increase of the people, and the obstacles which will prevent a correspondent increase of the representatives.

The Federalist No. LV. As to the charge that the membership of the House was too small to be a safe depository of the public interest, Madison, the man who had sought to double the number, wrote:

> Nothing can be more fallacious than to found our political calculations on arithmetical principles. Sixty or seventy men may be more properly trusted with a given degree of power than six or seven. But it does not follow that six or seven hundred would be proportionably a better depositary. And if we carry on the supposition to six or seven thousand, the whole reasoning ought to be reversed. The truth is, that in all cases a certain number at least seems to be necessary to secure the benefits of free consultation and discussion, and to guard against too easy a combination for improper purposes; as, on the other hand, the number ought at most to be kept within a certain limit, in order to avoid the confusion and intemperance of a multitude. . . .

The Federalist No. LV.

Mr. Madison concluded with some remarks on the dangers of an excessive number of representatives in the House.

> One observation, however, I must be permitted to add on this subject as claiming, in my judgment, a very serious attention. It is, that in all legislative assemblies the greater the number composing them may be, the fewer will be the men who will in fact direct their proceedings. In the first place, the more numerous an assembly may be, of whatever characters composed, the greater is known to be the ascendancy of passion over reason. In the next place, the larger the number, the

greater will be the proportion of members of limited information and of weak capacities. . . . On the same principle, the more multitudinous a representative assembly may be rendered, the more it will partake of the infirmities incident to collective meetings of the people. . . . The people can never err more than in supposing that by multiplying their representatives beyond a certain limit, they strengthen the barrier against the government of a few. Experience will for ever admonish them that, on the contrary, *after securing a sufficient number for the purposes of safety, of local information, and of diffusive sympathy with the whole society,* they will counteract their own views by every addition to their representatives. The countenance of the government may become more democratic, but the soul that animates it will be more oligarchic. The machine will be enlarged, but the fewer, and often the more secret, will be the springs by which its motions are directed. (Emphasis in original).

The Federalist No. LVIII.

Thus both the historical background and the plain meaning of the Constitution support the power of Congress to fix the number of representatives at a figure less than the maximum of one for every 30,000 inhabitants. Plaintiff quotes language from *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) concerning the importance of a citizen's vote for lawmakers, but the case dealt only with the need for equality in population of Congressional districts, and lends no support to plaintiff's cause.

The lack of merit in plaintiff's argument is so obvious that a single judge can reject it without convening a three-judge court. *Goosby v. Osser,* 409 U.S. 512, 518, 93 S.Ct. 854, 858–59, 35 L.Ed.2d 36 (1973); *Ex parte Poresky,* 290 U.S. 30, 32, 54 S.Ct. 3, 4–5, 78 L.Ed. 152 (1933).

It is ORDERED that the plaintiff's motions to convene a three-judge court and for summary judgment are denied; and it is further

ORDERED that the defendant's motion for summary judgment is granted, and the complaint is dismissed.